```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CAROL DURRELL, PARENT AND        :    CIVIL ACTION
EDUCATIONAL DECISION MAKER FOR   :
S.H.                             :
                                 :
          v.                     :
                                 :
LOWER MERION SCHOOL DISTRICT     :    NO. 10-6070
```

MEMORANDUM

Bartle, J.                                       July 19, 2012

    Plaintiffs S.H. and her mother Carol Durrell ("Durrell") bring this action against the Lower Merion School District ("School District") for violation of Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.[1]  Before the court is the motion of the School District for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

              I.

    Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

---

1.  We previously granted the School District's motion to dismiss S.H.'s claim under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. for failure to state a claim for which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Durrell v. Lower Merion School District, No. 10-6070, 2011 WL 2582147 (E.D. Pa. June 30, 2011).

P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).

A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable jury to find for the plaintiffs.  Id. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  We view the facts and draw all inferences in favor of the non-moving party.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  When ruling on a motion for summary judgment, we may only rely on admissible evidence.  See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

II.

The following facts are viewed in the light most favorable to S.H. and her mother as the nonmoving parties.  S.H. is a recent graduate of Lower Merion High School.  During first grade, S.H. was placed in Title I, a federally-funded program for students who are not meeting benchmarks in reading comprehension.  Title I is not considered special education and includes both children with disabilities and those without disabilities.  The program provides students with 30 minutes of supplemental reading instruction daily.  In her deposition testimony, S.H.'s mother stated that although the School District characterized the program as an "enrichment program" designed to give children an "extra boost," Title I is actually a "remedial program" which caused S.H. to miss a portion of the regular curriculum classes.  She concedes that she never observed a Title I class.  Instead, she based this opinion on conversations she had with children in her community who are currently enrolled in Title I.[2]  She received letters explaining the Title I program and consented to S.H.'s placement in the program.  S.H. remained in the Title I program through fifth grade.

At the end of fourth grade in 2004, S.H.'s teacher told her mother that S.H. was "struggling" in math and reading.  As a

---

2.  We note that any testimony by S.H.'s mother regarding the statements of the children in her community would be hearsay if offered for the truth of the matter asserted and thus cannot be considered on summary judgment.  See, e.g., Blackburn, 179 F.3d at 95.

result, the School District conducted an educational evaluation of S.H. with her mother's consent.  Santa Cucinotta ("Cucinotta"), a psychologist employed by the School District, performed the evaluation.

Cucinotta tested S.H. with the Wechsler Intelligence Scale for Children IV, which measures a child's verbal comprehension, perceptual reasoning, working memory, processing speed, and full-scale intelligence quotient ("IQ").  Cucinotta also used the Wechsler Individual Achievement Test II, which assesses a student's achievement in three composite areas, reading, mathematics, and written language, and seven subtest areas, including word reading, reading comprehension, pseudo-word decoding, numerical operations, math reasoning, spelling, and written expression.

To determine whether S.H. had a specific learning disability, Cucinotta made use of the predicted achievement discrepancy formula.  Under that formula, a psychologist standardizes a student's scores on these tests by comparison to a pool of other test-takers.  The psychologist then measures the difference between the student's standardized intelligence scores, typically the student's full scale IQ, and his or her standardized achievement scores.[3]  The School District does not

---

3.  There are several methods to determine whether a student has a specific learning disability.  Another discrepancy model is the simple comparison model.  Under that approach, the psychologist calculates the difference between a student's IQ and achievement score without comparison to a standard pool of test takers.

have a policy regarding what difference constitutes a discrepancy which is sufficiently severe to demonstrate that a student has a specific learning disability.  However, Dr. Joanna Wexler, a certified school psychologist employed by the School District, reports that a discrepancy of 10 to 14 points between a student's IQ and achievement scores may indicate a specific learning disability.  Debra Lubowicki, the Elementary Supervisor for Special Education for the School District, testified in her deposition that psychologists in the School District generally used a 15-point discrepancy as the benchmark.

Cucinotta's evaluation showed that S.H. had a full scale IQ of 106, which was in the average range.  The testing, however, showed a discrepancy of 14 points between S.H.'s full scale IQ and her reading composite score.  There was also noted a discrepancy of 14 points between S.H.'s IQ and her word reading subtest, and a 16-point discrepancy between S.H.'s IQ and her reading comprehension subtest.  Finally, a 16 point discrepancy was found between S.H.'s IQ and one of her math subtests, numerical operations.  Cucinotta set forth in her evaluation S.H.'s difficulties in performing various tasks during the testing and her below-benchmark scores on two standardized tests, the Pennsylvania System of School Assessment and the Degrees of Reading Power.  She also relied on information provided by S.H.'s teacher.

Cucinotta performed portions of the Children's Self-Report and Projective Inventory and concluded that S.H. had "a

good self-concept overall." She noted that S.H. had advised her that she did not want to receive special education services. Although it is not mentioned in the evaluation, Cucinotta stated in her deposition that she was aware at the time of the evaluation that there had been a serious tragedy in S.H.'s family, specifically a murder-suicide involving several of her relatives in 2002, and that she consulted with S.H.'s guidance counselor Dr. Gloria Falcone regarding the incident. Cucinotta concluded in her evaluation that S.H. had a specific learning disability in reading and math.

     Plaintiffs have several adverse criticisms of Cucinotta's report. According to their experts and the testimony of one School District employee, a specific learning disability requires a discrepancy of at least one standard deviation, or 15 points. Their experts further opine that only composite scores, not subtests, should be used to compare a student's achievement with his or her IQ. Accordingly, S.H. did not meet the criteria for having a specific learning disability under their analysis. Plaintiffs further point out that Cucinotta did not conduct a classroom evaluation, as required under regulations then in effect. However, as discussed above, S.H.'s teacher shared her classroom observations of S.H. with Cucinotta. Finally, plaintiffs' experts maintain that Cucinotta failed to give sufficient weight to the possibility that S.H. was suffering from an emotional disturbance at the time due to the serious tragedy which occurred in her family.

After the evaluation, a team of school staff met with S.H.'s mother to create an Individual Education Plan ("IEP"). The team recommended that S.H. receive throughout fifth grade 30 minutes of speech and language therapy per week and daily 60-minute sessions of specialized reading/language arts and math instruction. S.H.'s mother received a Notice of Recommended Placement summarizing the team's recommendation and a copy of her rights under the IDEA. She then approved the placement for her daughter.

During middle school, S.H. continued to receive special education services under an IEP approved by her mother. She was placed in an Instructional Support Lab ("ISL"), which is a resource-room setting for students with learning disabilities to receive services such as extra assistance with homework and exams. This class caused S.H. to miss science class throughout middle school and one year of Spanish class. ISL grades are not counted in a student's grade point average. In S.H.'s view, ISL was a "waste of time" that impeded her academic progress.

In 2007, the School District removed S.H. from special education services for language arts due to her progress in that subject. She continued to receive support in reading and writing. Thereafter, in September, 2009, S.H. was reevaluated by Dr. Craig Cosden ("Cosden"), another School District psychologist. Cosden concluded that S.H. continued to be eligible for special education and recommended that she attend ISL for three class periods every four days. Cosden also

recommended that S.H. meet with a literary and math specialist for 30 minutes every four days during her ISL time.  Nonetheless, Cosden recommended that S.H. be removed from speech and language therapy because of her improved performance in this respect.

The reevaluation report showed that S.H.'s full-scale IQ was 86.  S.H. tested as average on her reading composite score and all reading subtests except for reading comprehension, which was below average.  She was found to be below average or low average in achievement in all math scores and average in written language.  According to plaintiffs' experts, Cosden failed to take into account whether S.H. was again suffering from an emotional disturbance due to the remarriage of S.H.'s mother during the 2004-2005 school year and the death of a close friend of hers in 2006.  They also opine that Cosden failed to consider indicators of S.H.'s improved academic performance after the 2004 evaluation, including her scores on several classroom assessments, the Pennsylvania System of School Assessment, and her report cards.

In May, 2009, Cosden attended a meeting with S.H.'s mother and her counsel.  During that meeting, plaintiffs requested a copy of the testing protocols used by Cosden in the 2009 reevaluation.  The protocols were described by Cosden as "the paperwork itself that tests are printed on or answers are recorded on" which are "published by the test manufacturer."  Cosden informed the family that the testing protocols had been destroyed.  This was untrue.  Cosden admits that he misled the

family because he did not want to provide the protocols to "persons who have no ability to be able to process and understand the information" contained on them. He also stated that he did not provide them to plaintiffs because of copyright infringement policies and ethical standards. Cosden later provided the protocols pursuant to a subpoena. The protocols are not part of the record before the court and thus their exact contents are unknown.

In January, 2010, the plaintiffs had S.H. independently evaluated by a certified school psychologist, Dr. Umar Abdullah-Johnson ("Abdullah-Johnson"). He found that S.H.'s full-scale IQ was 100. He placed her in the average to superior range for all areas except for reading comprehension and fluency, in which S.H. was below average range. He found that any discrepancy between her intelligence and achievement was too small to support the existence of a specific learning disability. He then concluded:

> The central finding of this Independent Educational Evaluation (TEE) [sic] is that [S.H.] appears to have never met the criteria for a diagnosis of Specific Learning Disability (SLD). At the time of initial diagnosis during the 5th grade, [S.H.'s] reading and math standard scores ... were within the Average range.... In addition, during this time, [S.H.] was still grieving the loss of several family members to a violent tragedy, which could have at least partially accounted for any skill delays perceived by the evaluating psychologist at this time. This determination is supported by standardized test scores and report cards during the 4th grade and beyond, which show that [S.H.] was progressing adequately.

Afterwards, in April, 2010, Cosden reevaluated S.H. He wrote that S.H.'s mother had requested that S.H. continue to receive speech and language services. S.H.'s mother denies making this request. Cosden concluded that S.H. remained a student with learning disabilities although S.H. no longer required special education supports. He recommended that she be moved out of all special education programs due to her progress in school.

In April, 2010, at the request of her mother, S.H. was removed from all special education programs. She spent the remainder of her last two years in high school in regular education classes. According to plaintiffs, S.H.'s receipt of special education services damaged her self-confidence and academic progress. It also prevented her from participating in certain regular curriculum classes, including science and one year of foreign language during middle school, and higher-level courses during high school. Her expert calculates her damages as $127,010, which includes two additional years of college tuition, 50 hours of psychotherapy, and 600 hours of tutoring.

As of the date of her deposition on February 14, 2012, S.H. had been accepted to West Virginia University, Kutztown University, Cabrini College, and Neumann University. S.H. had also applied to West Chester University and Temple University but as of that time had not yet received any decision on her admission to these schools.

III.

The Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).  The ADA similarly states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

The standards governing S.H.'s Rehabilitation Act and ADA claims are the same.  See Chambers v. Sch. Dist. of Phila., 587 F.3d 176, 189 (3d Cir. 2009).  To prevail on these claims, plaintiffs must demonstrate that S.H.:  (1) has a disability; (2) "was otherwise qualified to participate in a school program;" and (3) "was denied the benefits of the program or was otherwise subject to discrimination because of her disability."[4]  Id.  The definition of disability under both the Rehabilitation Act and the ADA includes not only an individual who is actually disabled but also anyone who is "regarded as" having a disability.  42 U.S.C. § 12102(1)(C); 28 U.S.C. § 705(2)(B).

---

4.  Under the Rehabilitation Act, a plaintiff must also establish that the school district received federal funds.  See Centennial Sch. Dist. v. Phil L., et al., 799 F. Supp. 2d 473, 481 (E.D. Pa. 2001).  This element is not in dispute.

-11-

There is no dispute that S.H. was regarded as disabled by the School District and that she was otherwise qualified to participate in school activities. Thus, the sole issue before us is whether plaintiffs have put forth sufficient evidence to raise a genuine dispute of material fact that S.H. was denied the benefits of a school program or subject to discrimination on the basis of her perceived disability. Plaintiffs assert that the School District discriminated against S.H. by: (1) placing her in Title I classes; (2) misidentifying her as a student with disabilities; (3) excluding her from regular education classes; and (4) placing her in ISL classes, which are not counted towards a student's grade-point average.

The School District maintains that it is entitled to summary judgment on S.H.'s claim for compensatory damages because plaintiffs have failed to adduce any evidence that it intentionally discriminated against S.H. Plaintiffs assert that they need not prove that the School District's discrimination was intentional in order to recover under the Rehabilitation Act and the ADA. In support, they cite our Court of Appeals' decision in <u>Ridgewood Board of Education v. N.E.</u>, 172 F.3d 238, 253 (3d Cir. 1997), <u>superseded by statute on other grounds</u>, <u>P.P. v. West Chester Area Sch. Dist.</u>, 585 F.3d 727, 730 (3d Cir. 2009). Since <u>Ridgewood</u> was decided, the Supreme Court has made clear that the remedies available under the ADA and Rehabilitation Act "are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964."

Barnes v. Gorman, 536 U.S. 181, 185 (2002).  Under Title VI, a plaintiff may not recover compensatory damages absent proof of intentional discrimination.  See Alexander v. Sandoval, 532 U.S. 275, 282-83 (2001).  In light of these decisions, Ridgewood has been superseded.  Not surprisingly, we note that all Courts of Appeals to address the issue since Sandoval and the majority of district courts within the Third Circuit have reached the conclusion enunciated by the Supreme Court.  See, e.g., Meagley v. City of Little Rock, 639 F.3d 384, 388-89 (8th Cir. 2011); Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126 & n.20 (1st Cir. 2003); Chambers v. Sch. Dist. of Phila., 827 F. Supp. 2d 409, 422-23 (E.D. Pa. 2011).  These courts have required some evidence of intent, such as bad faith, gross misjudgment, or deliberate indifference, to sustain a claim for compensatory damages under these statutes.  Chambers, 827 F. Supp. 2d at 425.

       We are not aware, and neither party has cited, a case in which a plaintiff student has alleged that he or she was incorrectly identified as disabled and discriminated against on that basis, in violation of the ADA and the Rehabilitation Act.  However, there are several decisions in which plaintiffs have alleged the inverse, that is, that the student was wrongly classified as non-disabled and excluded from special education services on that basis.  In Maus v. Wappingers Central School District, a school district refused to classify a student with attention deficit disorder, anxiety, and Asperger's Syndrome as disabled under the IDEA because she was performing at average or

-13-

above average level in her studies. 688 F. Supp. 2d 282, 288-93 (S.D.N.Y. 2010). The student and parent subsequently brought claims against the school district for violation of the IDEA, ADA, and Rehabilitation Act. Id. In support of their ADA and Rehabilitation Act claims, plaintiffs stated:

> [t]here are triable issues of fact precluding a grant of summary judgment on the Section 504 and Title II claims with respect to the 2003-2004 school year. The defendants knew [K.M.] was disabled-not just ADHD, but developmentally (and socially) disadvantaged. This put her in an obviously inferior position to [her] more able peers and left her vulnerable to social isolation, anxiety and depression. Her mother's efforts to bring [K.M.'s] problems [to] the defendants' attention was [sic] to no avail.

Id. at 301. The district court granted summary judgment in the school district's favor on plaintiffs' ADA and Rehabilitation Act claims. It reasoned that a claim that a school district misclassified a student, without any evidence of bad faith or gross misjudgment, cannot survive summary judgment under these statutes. Id. at 302. The court further stated that a school district is not required "to provide students with disabilities with potential maximizing educations, only reasonable accommodations that give those students the same access to the benefits of a public education as all other students." Id. (quoting J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 71 (2d Cir. 2000)).

Similarly, in Sellers v. School Board of the City of Mannassas, a student and his parents brought a claim under the

-14-

ADA and Rehabilitation Act against a school district for failure to identify him as disabled.  141 F.3d 524, 528 (4th Cir. 1998).  The district court granted the school district's motion to dismiss the plaintiffs' claim for failure to state a claim under Rule 12(b)(6).  Id. at 529.  The Court of Appeals for the Fourth Circuit affirmed on the ground that the plaintiffs had failed to state that the School District intentionally discriminated against them.  In doing so, it stated:

> "The reference in the Rehabilitation Act to 'discrimination' must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist.  Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter.  That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made ... is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her handicap."

Id.  (quoting Monahan v. Nebraska, 687 F.2d 1164, 1170 (8th Cir. 1982)).  To require less than intentional discrimination would be to invite claims of "educational malpractice."  See, e.g., Sellers v. Sch. Bd. of City of Manassas, 960 F. Supp. 1006, 1013-14 & n.32 (E.D. Va. 1997).  Such tort claims for monetary damages stemming from the wrongful identification of a student as disabled have been uniformly rejected.  Id.; see also Agostine v. School Dist. of Phila., 527 A.2d 193 (Pa. 1987); Doe v. Board of Educ. of Montgomery Cnty., 453 A.2d 814 (Md. 1982).

While plaintiffs contend that intent to discriminate is not necessary, they attempt to set forth evidence of discriminatory intent.

Assuming that plaintiffs must establish the School District's intent to discriminate, they point out that psychologists for the School District concede that they have a great amount of discretion when conducting evaluations. Plaintiffs reason that this discretion gave school psychologists the opportunity to discriminate against S.H. Plaintiffs also reference as evidence of the School District intentional discrimination that the 2010 reevaluation of S.H. by Cosden omitted mention of the fact that the educational evaluator engaged by plaintiffs, Abdullah-Johnson, had concluded that the identification of S.H. as disabled was an error. The plaintiffs further assert that Cosden "intentionally misrepresented" the wishes of S.H.'s mother regarding the continuation of speech and language services for S.H. In response, Cosden explains that he did not reference Abdullah-Johnson's conclusion because "it wasn't relevant to the question at hand, which was does she qualify for services.... now." And as discussed above, although Cosden concluded in his 2010 reevaluation that S.H. remained a student with a disability, he recommended that she no longer receive special education services. As additional support of the School District's intent to discriminate against S.H., plaintiffs emphasize that Cosden purposely misled them into believing that testing protocols used to evaluate S.H. had been destroyed. As

-16-

we noted above, plaintiffs have not made these protocols a part of the record, and therefore the court is unable to make any judgment as to their significance.

Finally, as evidence of intentional discrimination, plaintiffs rely on the deposition testimony of S.H.'s mother that she relied on the judgment of School District employees and was misled by them.  She states that the School District mischaracterized the nature of the Title I program and her options for overriding teacher recommendations for course selections.  Plaintiffs also cite the School District policy which provides that ISL does not count towards a student's grade point average and then draw an inference that this policy was "intentionally" adopted to "limit[] the ability of S.H. to obtain as high a grade-point average as her peers in regular education." None of this is evidence that can reasonably be viewed as intentional discrimination against S.H. because the School District regarded her as disabled.  Instead, the record demonstrates that the letters and paperwork provided to S.H.'s mother regarding Title I and course selection contained the same information provided to any other parent in the School District. S.H.'s parent consented to all of S.H.'s placements and even at times requested additional services for S.H.  Similarly, there is no evidence that the policy regarding grade point averages and

ISL classes was adopted with S.H. in mind.  Instead, this policy applies to all students in ISL.[5]

In our view, plaintiffs have not produced any evidence of intentional discrimination which raises a trial issue of fact. We agree that plaintiffs have raised a genuine dispute of material fact regarding whether the School District was incorrect when it classified S.H. as having specific learning disabilities in math and reading.  Their experts have pointed to various defects in the initial evaluation and reevaluations of S.H. Plaintiffs have also produced at least some evidence that school staff may have been uncooperative with plaintiffs' initial attempts to remove S.H. from special education services, and in one instance was not truthful with plaintiffs about the existence of certain protocols.  At most, this evidence raises factual issues regarding whether the School District acted unreasonably in its treatment of S.H. and thus engaged, in effect, in educational malpractice.  The ADA and Rehabilitation Act, however, are not educational malpractice statutes.  While we find any misidentification of S.H. unfortunate, plaintiffs have not come forward with any evidence which would allow a reasonable

---

5. Additionally, plaintiffs point to the report of their expert Tawanna Jones who opines that "it was the intention of the Lower Merion School District to regard S.H. as disabled."  On a motion for summary judgment, a court may consider only admissible evidence.  See, e.g., Blackburn, 179 F.3d at 95.  An expert's opinion regarding intent would not be admissible at trial.  See Robinson v. Hartzell Propeller, Inc., 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004) (quoting In re Diet Drugs Products Liab. Litig., No. 12-1203, 2000 U.S. Dist. LEXIS 9037 (E.D. Pa. June 20, 2000)).

jury to find that the School District intentionally discriminated against S.H. when it regarded her as disabled.

Accordingly, the motion of the School District for summary judgment will be granted.[6]

---

6. Because we are granting the motion of the School District for summary judgment, we need not reach the two motions in limine to exclude expert reports and testimony filed by the School District and the two motions in limine filed by plaintiffs. For purposes of this motion, we have assumed without deciding that the opinions of plaintiffs' experts are admissible with the exception of Tawanna Jones's opinion that, as discussed in footnote 5, "it was the intention of the Lower Merion School District to regard S.H. as disabled."